UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ANTHONY FOX,

                    Plaintiff,

                                                        **Hon. Hugh B. Scott**

              v.                                        06CV148

                                                        (CONSENT)

THOMAS POOLE, et al.,                                   **Order**

                    Defendants.

          Before the Court are (a) defendants' motion for summary judgment (Docket No. 114[1])

and (b) plaintiff's cross motion for partial summary judgment (Docket No. 121, dated Mar. 31,

2008, filed Apr. 2, 2008, entered Apr. 8, 2008).  Response to defendants' motion was due by

April 4, 2008, any reply by April 18, 2008, and the motion was deemed submitted (without oral

argument) on April 18, 2008 (Docket No. 120), as was plaintiff's cross motion.  On August 25,

2006, the parties consented to proceed before the undersigned as Magistrate Judge (Docket

No. 17).

                              **BACKGROUND**

          Familiarity with the prior Orders in this case (Docket Nos. 25, 33, 65, 83) is presumed.

---

[1]In support of this motion, defendants submitted their statement of facts, Docket No. 115;
their memorandum of law, Docket No. 116; and the declarations of defendants Thomas Eagen
(as spelled in declaration, compare with caption) (with exhibits), Docket No. 117; J.P. Gregoire
(with exhibits), Docket No. 118; and Thomas Poole (with exhibits), Docket No. 119.
          In opposition to this motion (and in support of his own motion), plaintiff filed his motion
for partial summary judgment, Docket No. 121; his affidavit (with statement of undisputed and
disputed facts and exhibits), Docket No. 122; and his memorandum of law, Docket No. 123.

On March 13, 2006, plaintiff (proceeding <u>pro se</u> as an inmate) sued the superintendent of his former facility, Five Points Correctional Facility ("Five Points"), the director of Health Services for the New York State Department of Correctional Services ("DOCS"), the Five Points health services director, treating medical personnel at Five Points, the DOCS grievance director, and the State of New York for allegedly violating his constitutional rights by placing plaintiff in medical isolation for tuberculosis (or "TB") in September 2005 (Docket No. 1, Compl.).  This Court granted plaintiff's motion (Docket No. 2) to proceed <u>in forma pauperis</u> without dismissing any claims or parties (Docket No. 3).

In 2006, defendants separately answered the original Complaint (Docket Nos. 5-7, 11-13, 20).  Plaintiff moved to dismiss affirmative defenses on June 12, 2006 (Docket No. 8, at 2), which this Court denied (Docket No. 18, Order at 3).

*Amended Complaint*

Plaintiff moved for leave to amend the Complaint to allege a second ailment (Docket No. 67), which was granted on November 1, 2007 (Docket No. 83).  In the Amended Complaint (Docket No. 92), plaintiff alleges six causes of action.  First, he claims that he was deprived of his rights under the First, Eighth, and Fourteenth Amendments by "Illegally Confining" (<u>id.</u> at 6) plaintiff in medical isolation from September 22, 2005, to October 18, 2005, depriving him of access to a dermatologist for treatment of a severe skin rash that had been otherwise untreated while he was at Five Points (<u>id.</u> at 6-7).  While in isolation, plaintiff was deprived of other medical treatment and was denied access to facility programs and activities because of an alleged disability, an alleged positive tuberculosis test in 1990 or 1992 combined with plaintiff's HIV

positive status (id. at 7[2]), which was not mentioned at the time of the September 2005 assignment (id.).  Defendants also violated Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), by depriving him of medical and dental treatment and access to facility programs based solely on his disabilities (id.).

The second cause of action alleges that defendants used plaintiff's disabilities to retaliate against him for filing grievances and lawsuits against DOCS employees at Sing Sing and Eastern Correctional Facilities (id.).  He claims that his medical isolation was due solely to retaliatory motives and not based upon plaintiff's medical record (id.).

Plaintiff alleges in his third cause of action cruel and unusual punishment, in violation of the Eighth Amendment, in denying him access to adequate and appropriate treatment for his severe skin rash.  Plaintiff applied for a dermatologist appointment on or about August 29, 2005, but that request was denied because of plaintiff's medical isolation.  (Id. at 8.)

The fourth cause of action alleges that plaintiff was deprived of due process and equal protection of the laws, under the Fourteenth Amendment, in several ways.  First, plaintiff was confined in medical isolation in violation of his due process rights.  (Id. at 9-10.)  Second, DOCS Health Services Policy Manual § 1.18 (see Docket No. 118, Gregoire Decl., Ex. B), that served as the procedures for his isolation, violated the Equal Protection Clause by treating HIV positive

---

[2]Previously, the Court carefully avoided mentioning plaintiff's second ailment, see Docket No. 56, Order; Docket No. 83, Order at 7; see also Docket No. 55 (defense motion to file medical documents under seal), with plaintiff having the option of disclosing that ailment (if he chose) in amending the Complaint or the manner in which he filed that pleading (whether or not under seal), see Docket No. 83, Order at 7 (outlining plaintiff's options).  Since plaintiff openly declares his condition in his Amended Complaint and made no attempt to file it under seal, the Court will discuss his relevant medical conditions in this Order.

inmates differently than non-HIV positive inmates in regards to alleged or suspected tuberculosis test results (Docket No. 92, Am. Compl. at 10).  Plaintiff thus was discriminated against due to his HIV positive status and his alleged positive tuberculosis test diagnosis (id.).  Plaintiff also claims that defendants failed to follow their own procedure under § 1.18 in dealing with a suspected tuberculosis patient and that there was not a factual record for a positive tuberculosis test in 1990 or 1992 to warrant his eventual medical isolation (id.).

Plaintiff alleges in his fifth cause of action a violation of the ADA when defendants discriminated against him based upon his alleged positive tuberculosis test and his HIV positive status in denying him access to medical and dental treatment (id. at 10-11), essentially realleging what he claims (in part) in his first cause of action.

Finally, in his sixth cause of action, plaintiff asserts that defendants violated the Rehabilitation Act, alleging that Five Points is a "public entity" that receives "federal grants and/or assistance" from "federal programs" to be subject to that provision (id. at 11), again realleging the deprivations claimed in part in his first cause of action.  Plaintiff points to the period of his medical isolation as when he was deprived of access to all facility programs and activities, in particular deprived of dental treatment until November 29, 2005 (id. at 11-12).

Plaintiff then details the actions of the named defendants (id. at 12-18).  Defendant then-Superintendent (cf. Docket No. 119, Poole Decl. ¶ 1) Thomas Poole became aware of plaintiff's claims through the grievance process and Poole allegedly failed to investigate these complaints (Docket No. 92, Am. Compl. at 12).  Defendant Dr. Lester Wright, the director of DOCS Health Services, promulgated the Health Services Policy Manual § 1.18, the policy plaintiff claims is unconstitutional (id. at 12-13).  Defendant Dr. J.P. Gregoire, the Five Points Facility Health

Services Director, allegedly conspired with defendant physician assistant Robert Macomber to

place plaintiff in medical isolation, falsifying medical records from Macomber and defendant

Wendy Goines and depriving plaintiff of access to medical treatment and programs (id. at 13-14).

Dr. Gregoire allegedly did this in retaliation against plaintiff for filing other grievances and legal

actions (id. at 14-15).  Goines, the nurse administrator at Five Points, was in charge of the paper

work to admit inmates to medical isolation and allegedly conspired to place plaintiff into

isolation (id. at 15).  Macomber interviewed plaintiff on September 21, 2005, after which

plaintiff was x-rayed.  Macomber then conspired with other medical defendants to have plaintiff

placed in isolation.  (Id. at 16.)  Defendant Thomas Eagen, the then-director of grievances at

DOCS (cf. Docket No. 117, Eagen Decl. ¶ 1), became aware of plaintiff's complaints though

plaintiff's grievance appeals and Eagen failed to investigate plaintiff's complaints (Docket

No. 92, Am. Compl. at 17).

Plaintiff seeks compensatory and punitive damages (id. at 20).

*Subsequent Proceedings*

Defendants then separately answered the Amended Complaint (Docket Nos. 102-08; see

also Docket Nos. 96-101) and plaintiff filed a response to those Answers (Docket No. 109).

After some extensions of the dispositive motion deadline (see Docket Nos. 110, 111, 112; see

also Docket No. 113, leave granted to file an oversized memorandum), defendants filed the

present motion for summary judgment (Docket No. 114).

*Defendants' Motion for Summary Judgment*

Defendants contend that plaintiff's claims should be dismissed (Docket No. 114).

According to their motion, when plaintiff was transferred from Eastern Correctional Facility to

Five Points, his medical problem list indicated that he tested positive for tuberculosis and HIV

(Docket No. 115, Defs. Statement of Facts ¶ 2; Docket No. 118, Gregoire Decl. ¶ 5).  On or

about September 20, 2005, plaintiff missed two follow up appointments, so defendant Macomber

requested that plaintiff be sent to the medical department (Docket No. 115, Defs. Statement of

Fact ¶ 3; Docket No. 118, Gregoire Decl. ¶ 10).  Upon examination on September 21, 2005,

plaintiff was asymptomatic for tuberculosis except for weight loss, he had bilateral abscesses in

the axillae[3], not draining, which were symptomatic of extra pulmonary tuberculosis.  Because of

plaintiff's HIV history, certain tests were conducted indicating that he had a severely

compromised immune system or anergic state.  Although a chest x-ray did not reveal active

disease, because of plaintiff's history, he was admitted to respiratory isolation to rule out extra

pulmonary tuberculosis pursuant to Health Services Policy Manual § 1.18.  (Docket No. 115,

Defs. Statement ¶ 4; Docket No. 118, Gregoire Decl. ¶ 11).  Because of plaintiff's Purified

Protein Derivative ("PPD") positive history, plaintiff going without treatment, and his HIV

status, plaintiff was admitted to respiratory isolation (Docket No. 118, Gregoire Decl. ¶ 11; see

id. ¶¶ 5 (explaining PPD test), 8, 7 (plaintiff denying he had HIV or TB and refusing treatment

for either)).

Defendants claim that plaintiff's refusal of treatments for the tuberculosis prolonged his

isolation (Docket No. 115, Defs. Statement ¶ 5).  Plaintiff remained in isolation until he had

given three Acid Fast Bacillus ("AFB") sputum that were negative.  He had refused to give

sputum and had refused all medical treatment (Docket No. 116, Defs. Memo. at 21; Docket

---

[3]Axillary abscesses are localized collections of pus in the axilla, the armpit, that results in disintegration or displacement of tissue, Taber's Cyclopedic Medical Dictionary 8-9, 173 (16th ed. 1989).

6

No. 118, Gregoire Decl. ¶¶ 12, 18, 19).  While isolated, plaintiff did not have recreation outside of the isolation room (Docket No. 118, Gregoire Decl. ¶ 20, Ex. B, § 1.18, at 11).

Eventually, plaintiff provided sputum on October 3, 2005, which was tested and plaintiff was found to be asymptomatic and was released from medical isolation on October 18, 2005. Plaintiff returned to isolation on November 3, 2005, when his cultures revealed that his third sputum was growing AFB (Docket No. 118, Gregoire Decl. ¶¶ 12-15).  Plaintiff was tested again and was found to be asymptomatic and was released without further medical restrictions on December 5, 2008 (Docket No. 115, Defs. Statement ¶¶ 6-8).  While in isolation, plaintiff filed grievances to be allowed to participate in yard exercises, which were refused due to his medical isolation (id. ¶¶ 9-10).

*Plaintiff's Response*

Plaintiff contends that defendants Dr. Gregoire and Macomber admitted that they did not test plaintiff's "Axillary Abcesses" [sic] for extra pulmonary TB and that his September 21, 2005, x-ray was negative for pulmonary TB (Docket No. 122, Pl. Undisputed Facts ¶ 1). Defendants based their "'suspicions of plaintiff's alleged active T.B. status' solely on a recent loss of weight and the plaintiff (H.I.V.) Status," with plaintiff arguing that the weight loss could have been from his HIV (id. Undisputed Facts ¶ 2).  During his isolation, plaintiff lost 10-17 pounds and suffered from "severe itching, pain and stomach problems" which were (and remain) ineffectively treated (id. ¶ 4).

Plaintiff argues that there are material issues of fact regarding his 1992 and 1998 TB tests, the basis for the subsequent 2005 medical isolation.  As for the 1992 tests, he contends that his medical record indicates that he was tested at two different facilities on the same date, an

impossibility (Docket No. 122, Pl. Disputed Facts ¶ 5, Ex. B (Bates No. 0002)).  As for the 1998

test, plaintiff disputes the test result and the information relied upon by defendants and the

accuracy of plaintiff's medical record (id. Pl. Disputed Facts ¶ 5), without presenting evidence to

support his contention.

He contends that there is a fact issue regarding the level of care he was afforded for his

skin condition while in medical isolation (id. ¶ Pl. Disputed Facts ¶ 6, Ex. A (plaintiff's medical

records, Sept.21-Oct. 18, 2005)).  He argues that his transfer from Eastern Correctional Facility

to Five Points (and from a single cell at Eastern to double cell for a time while at Five Points)

was retaliatory, or at least raised an issue of fact (id. Pl. Disputed Facts ¶ 7, Ex. C (transfer order

from Eastern to Five Points)).  In addition, since plaintiff was placed in medical isolation less

than one month after transferring to Five Points without any evidence (in plaintiff's view) of

medical necessity, he concludes that this placement was retaliatory (id. Pl. Disputed Facts ¶ 7).

*Plaintiff's Motion for Partial Summary Judgment*

Plaintiff cross moves for partial summary judgment on the admissions of defendants,

namely that the facility received federal funds (Docket No. 123, Pl. Memo. at 25; Docket No. 73,

Defs. Supp'al Responses to Pl. 2d Request for Admission, at 4, response to Request # 11) and

that plaintiff had a negative chest x-ray for tuberculosis and that they did not test his "'Axillary

Abcesses' [sic] for extra-pulmonary T.B." (Docket No. 123, Pl. Memo. at 25).

## DISCUSSION

I.      Summary Judgment Standards

Summary judgment is appropriate only if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits show that there is no genuine

8

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003); Fed. R. Civ. P. 56(c).   The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists.  In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. Ford, supra, 316 F.3d at 354.  "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1535 (2d Cir.) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)), cert. denied, 522 U.S. 864 (1997).  While the moving party must demonstrate the absence of any genuine factual dispute, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), the party against whom summary judgment is sought, however, "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (emphasis in original removed); McCarthy v. American Intern. Group, Inc., 283 F.3d 121, 124 (2d Cir. 2002); Marvel Characters v. Simon, 310 F.3d 280, 285-86 (2d Cir. 2002).

Rule 56(d) allows the Court to "determine what material facts are not genuinely at issue. The court should so determine by examining the pleadings and evidence before it and by interrogating the attorneys.  It should then issue an order specifying what facts–including items of damages or other relief–are not genuinely at issue.  The facts so specified must be treated as established in the action." Fed. R. Civ. P. 56(d)(1) (effective Dec. 1, 2007).  When the Court cannot grant summary judgment on the entire case, "it is empowered, when it would be

practicable to save time and expense and to simplify the trial, to issue an order that specifies the facts that appear without substantial controversy," 10B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2737, at 311-12 (Civil 3d ed. 1998) (footnote omitted).  Under Rule 56(d)(1), the Court does not enter judgment on part of a claim or grant partial relief; this rule merely allows the Court to specify issues that are not controverted, id. at 316, 318, and is better referred to as a "partial summary adjudication" to avoid the confusion with a judgment, id. at 324, 322-24.  If the Court determines that entering partial summary judgment does not materially expedite the adjudication, the Court may decline to do so, id. at 319.

II.     Defense Motion for Summary Judgment

        Plaintiff complains about being placed in medical isolation for over three months (thus deprived access to prison programs and other medical treatment) due to two purported ailments. Defendants raise several defenses and immunities to reject these claims.

        A.      Tuberculosis Protocol and § 1.18

        Plaintiff's claims arise from defendants' imposition of DOCS protocols for suspicion that he was positive for tuberculosis, pursuant to Health Services Policy Manual § 1.18 (see Docket No. 118, Gregoire Decl. Ex. B), and the deprivations inherent in medical isolation.  The Court first looks at that protocol.

        "Tuberculosis is a highly infectious contagious disease.  It is spread through the air." Selah v. Goord, 255 F. Supp. 2d 42, 45 (N.D.N.Y. 2003) (citation to record omitted).  The Northern District of New York, in Selah, noted that there were three types of tuberculosis infection–latent, active, and active contagious.  Latent tuberculosis is from mere exposure to

10

tuberculosis and without the exposed person experiencing effects from the disease, id.  Active

tuberculosis "occurs when the body is not able to contain the tuberculosis bacillus and the

individual becomes ill," id.  When infected "the individual will exhibit signs and symptoms of

the disease such as coughing, night sweats, chills and weight loss," id. (record citation omitted).

Active contagious tuberculosis "is the form of active tuberculosis where the infection exists in an

individual's lungs" and when so infected, "the individual is capable of spreading the disease to

others through the shared air space," id. (footnote omitted).  Five to ten percent of persons with

latent TB will develop active TB in their lifetimes, while those who are HIV positive have a

higher percentage, id.

Section 1.18 of the Health Services Policy Manual is DOCS's TB control program, which

is "composed of overlapping statewide systems for prevention, detection, containment, and

treatment of tuberculosis infection and tuberculosis disease" (id. Ex. B, § 1.18, at 3).  An inmate

under this policy is considered infected with TB if they are PPD positive (id.), see also Selah,

supra, 255 F. Supp. 2d at 46.  Symptoms of TB stated in the policy include persistent cough,

hemoptysis (expectoration of blood arising from the oral cavity, larynx, trachea, bronchi, or

lungs, Taber's Cyclopedic Medical Dictionary, supra, at 810), fever, chills, night sweats, weight

loss, with "inmates with active, contagious disease may have only one (or rarely none) of these

symptoms" (id.).  Inmates are screened for TB upon entry into DOCS custody and at least one

annually (id. at 5).  Conditions known to increase an infected inmate's risk of developing active

TB include HIV infection and immunosuppressive therapy (id.).  Inmates with documented

positive PPD tests do not need annual chest x-rays or repeat PPD tests (id. at 7).  Under that

protocol, if an inmate is suspected of having an infectious disease (such as tuberculosis), that

inmate is placed in medical isolation until that suspicion is confirmed (id. at 9-13).  While in

medical isolation, the inmate can leave only for medical treatments unavailable within isolation

(id. at 10), the inmate cannot leave the room for recreation (id. at 11).

According to Dr. Gregoire, possible TB infection is measured by swelling under the skin

called induration, with a five millimeter or more induration being considered significant (or

positive) for the highest risk groups, "including:  immunosuppressed people such as people with

HIV," (Docket No. 118, Gregoire Decl. ¶ 6).  Ten or more millimeter induration is considered

significant (or positive) for others (id.).  Inmates with HIV receive PPD testing and, if that test is

negative, they will have a CD4 count done; if the count is less than 300, the inmate will have his

blood tested for TB 60 or more days after the PPD test (id. ¶ 9).  Any inmate suspected of having

TB, with or without a positive skin test, is placed in medical isolation pending evaluation,

pursuant to Health Services Policy Manual § 1.18, at 3, 5, 8 (id.).

Plaintiff was placed in medical isolation to rule out extra pulmonary tuberculosis (id.

¶ 11).  Plaintiff refused AFT and highly active antiretroviral therapy (or "HAART") prolonging

the duration of his isolation (id. ¶ 12; see Docket No. 122, Pl. Aff. Ex. B, Bates No. 0005) and

Dr. Gregoire stated that plaintiff "remained upset and argumentative throughout the isolation"

(Docket No.118, Gregoire Decl. ¶ 18).

B.      Eleventh Amendment Immunity

Defendants first argue that claims against them in their official capacity should be

dismissed pursuant to the immunity granted to states by the Eleventh Amendment to the

Constitution (Docket No. 116, Defs. Memo. at 3-4; see also id. at 8 (official capacity claims

against individual defendants are barred by Eleventh Amendment immunity as if the state were

named).  Plaintiff contends that Dr. Wright can be held liable in his official capacity as the chief

policy maker that enacted Health Services Policy Manual § 1.18 (Docket No. 123, Pl. Memo. at

3-4, citing Monell v. Department of Soc. Servs., 436 U.S. 658, 690-91 (1978)).

The Eleventh Amendment provides that "The Judicial power of the United States shall

not be construed to extend to any suit in law or equity, commenced or prosecuted against one of

the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State,"

U.S. Const. amend. XI.  Monell involved municipal liability under § 1983 and whether the

municipality is the ""person" under that statute, and is not applicable in this case.

Thus, the defendant State of New York and those individuals sued in their official

capacities **are immune** and the claims against them (save the Title II ADA and Rehabilitation

Act claims, discussed below) are **dismissed**.  What remains, then, are (a) claims against the

individual defendants in their individual capacities and (b) the possible Title II ADA and

Rehabilitation Act claims.

C.     Personal Involvement of Some Defendants

Next, defendants contend that plaintiff fails to allege personal involvement of defendants

Poole, Eagen, and Wright to make them liable (Docket No. 116, Defs. Memo. at 4-7).

1.     Superintendent Poole

Poole was the superintendent of Five Points and his only role here was in the grievance

process when plaintiff complained about the substantive violations by other parties, while Eagen

was the director of grievances at DOCS.  Dr. Wright promulgated Health Services Policy Manual

§ 1.18 which plaintiff claims is unconstitutional.  Although plaintiff sought Eagen to have him

investigate plaintiff's allegations, Eagen was never involved in the investigation of his grievance (Docket No. 115, Defs. Statement ¶ 13; Docket No. 117, Eagen Decl. ¶ 5).

Plaintiff argues that Poole and Eagen may be held personally responsible for being placed on notice during the grievance process of the violations and failing to act and by exhibiting deliberate indifference by failing to act on information that unconstitutional acts were occurring (Docket No. 123, Pl. Memo. at 6).  Plaintiff, however, fails to show the involvement of Poole or Eagen aside from conducting grievances, see Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).  Mere receipt of a grievance and recipient's subsequent inaction is insufficient to establish a claim of personal involvement by a correctional supervisor, Harris v. Westchester County Dep't of Corrections, No. 06 Civ. 2011, 2008 U.S. Dist. LEXIS 28372, at *28 (S.D.N.Y. Apr. 2, 2008); Rivera v. Goord, 119 F. Supp. 2d 327, 344 (S.D.N.Y. 2000).  Personal involvement would be found where a supervisory official receives and acts upon an inmate's grievance or otherwise reviews and responds to his complaint, Johnson v. Wright, 234 F. Supp. 2d 352, 363-64 (S.D.N.Y. 2002).  Plaintiff here alleges that Poole was aware of his claims from the grievances he filed (Docket No. 92, Am. Compl. at 5-6; Docket No. 1, Compl. at 5-6, Exs. A, B, B-1, B-2), where Poole responded to one grievance to reject it on the basis of the protocol in Health Services Policy Manual § 1.18 (Docket No. 1, Compl. Ex. B-2), **hence stating Poole's personal involvement**.

2.      Eagen

Plaintiff also alleges similar correspondence to Eagen, with Eagen responding that plaintiff had to follow grievance procedures rather than separate missives (id. Ex. D-1; see also Docket No. 117, Eagen Decl.).  He does not show, however, how Eagen could have remedied the

alleged constitutional violations in his role as director of grievances.  Eagen's role as Director of

the Inmate Grievance Program was to administer that program and inform grievant inmates, like

plaintiff, of the status of their grievances (Docket No. 117, Eagen Decl. ¶¶ 5-8).  Thus, the claims

against Eagen are **dismissed**.

> 3.     Dr. Wright

One of the ways to find personal involvement is institution of a policy which permits an

infraction to occur, Colon, supra, 58 F.3d at 873; Williams v. Smith, 781 F.2d 319, 323 (2d Cir.

1986); Turpin v. Mailet, 619 F.2d 196, 201 (2d Cir.), cert. denied, 449 U.S. 1016 (1980).

Defendants argue that Dr. Wright was not involved in the decision to isolate plaintiff and did not

receive plaintiff's grievances (Docket No. 116, Defs. Memo. at 7).  But as author of the Health

Services Policy Manual at issue, Dr. Wright has personal involvement in enacting the policy that

lead to plaintiff's medical isolation (see Docket No. 123, Pl. Memo. at 3-4).  Therefore, plaintiff

**has stated the personal involvement by policy maker Dr. Wright**; the issue becomes whether

that policy creates a constitutional infraction.

> D.     Title II of the Americans with Disabilities Act and the Rehabilitation Act

Plaintiff's claims that defendants violated Title II of the ADA and the Rehabilitation Act.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of

such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity," 42 U.S.C. § 12132, while the Rehabilitation Act

prohibits discrimination against a qualified individual with a disability "solely by reason of her or

his disability," in excluding them "from the participation in, be denied the benefits of, or be

subjected to discrimination under any program or activity receiving Federal financial assistance .

. . ," 29 U.S.C. § 794(a).

        1.      Eleventh Amendment Immunity

Defendants respond that the individual defendants (either in their official or individual

capacities) cannot be sued under either act, Garcia v. State Univ. of N.Y. Health Sciences Ctr. of

Brooklyn, 280 F.3d 98, 107 (2d Cir. 2001) (Title II and Rehabilitation Act do not provide for

suits against persons in their individual capacity); Coles v. Goord, No. 9:01CV1819, 2002 U.S.

Dist. LEXIS 22519, at *6-7 (N.D.N.Y. Nov. 22, 2002) (dismissed ADA claim against individual

defendants both individual and official capacities because DOCS is appropriate defendant);

Warren v. Goord, No. 99CV296, 2006 U.S. Dist. LEXIS 41096, at *9 (W.D.N.Y. May 26, 2006)

(Foschio, Mag. J.) (discussing affirmance of earlier dismissal of ADA claims against defendants

in their official and individual capacities, 81 Fed. Appx. 400 (2d Cir. 2003)); Parkinson v. Goord,

116 F. Supp. 2d 390, 399 (W.D.N.Y. 2000) (Larimer, J.) (Docket No. 116, Defs. Memo. at 7-8).

A suit against defendants in their official capacity is, in effect, a suit against the state and, as

such, is governed by the Eleventh Amendment, Will v. Michigan Dep't of State Police, 491 U.S.

58, 71 (1989) (id. at 8).  Defendants also contend that plaintiff fails to show a constitutional

violation or animus required for an ADA claim, Garcia, supra, 280 F.3d at 112 (need proof of

discriminatory animus or ill will due to disability) (id. at 8-12).

Plaintiff counters that he did not assert claims against the individual defendants in their

personal capacities but, if he did, courts have recognized personal capacity actions under the

ADA or the Rehabilitation Act, see K.M. ex rel. D.G. v. Hyde Park Cent. Sch. Dist., 381 F.

Supp. 2d 343, 362-63 (S.D.N.Y. 2005) (Docket No. 123, Pl. Memo. at 7).  But K.M. held that

§ 1983 claims "can be maintained against individual defendants on the basis of Title II [of the ADA] or Section 504 [Rehabilitation Act] violations," id. at 362, citing Weixel v. Board of Educ. of City of N.Y., 287 F.3d 138, 146, 151 (2d Cir. 2002).  The court went on to discuss the qualified immunity of the school district official defendants in that case, 381 F. Supp. 2d at 362-63.

The ADA declares that "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this chapter," 42 U.S.C. § 12202; see United States v. Georgia, 546 U.S. 151, 154 (2006) (accepting this provision as an "unequivocal expression of Congress's intent to abrogate state sovereign immunity"); Board of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 363-64 (2001).  Although states have been held to be immune from suit under Title I of the ADA under the Eleventh Amendment, Garrett, supra, 531 U.S. at 360, n.1, the Supreme Court has allowed a suit against a state under Title II of the ADA where the suit sought to vindicate a fundamental right (such as access to courts), Tennessee v. Lane, 541 U.S. 509 (2004), or where a constitutional violation occurs, United States v. Georgia, supra, 546 U.S. at 154 (conditions of confinement in state prison) (Docket No. 116, Defs. Memo. at 8-9; cf. Docket No. 123, Pl. Memo. at 4); cf. Pennsylvania Dep't of Corrections v. Yeskey, 524 U.S. 206 (1998) (Title II applies to state prisons as "public entities" under act, nowhere raising Eleventh Amendment immunity).  Defendants argue that Lane and United States v. Georgia did not state the full extent of Title II's reach and whether all Eleventh Amendment immunity was abrogated, concluding that sovereign immunity was abrogated only when plaintiffs establish the violation

17

was motivated by discriminatory malice or ill will (id. at 9-10, quoting Castells v. Fisher,

No. 05CV4866, 2007 U.S. Dist. LEXIS 30188, at *13 (E.D.N.Y. Mar. 23, 2007)).

Plaintiff argues that the Second Circuit has held that a § 1983 claim against individual

defendants may be maintained for violations of Title II of the ADA or the Rehabilitation Act,

Weixel, supra, 287 F.3d at 146, 151 (Docket No. 123, Pl. Memo. at 5).  The issue in Weixel,

however, was whether the pro se plaintiffs alleged that the infant plaintiff was disabled under the

ADA or Rehabilitation Act to resist a motion to dismiss, 287 F.3d at 146-47, and did not reach

the issue whether defendants could be sued in their individual capacities.  The Second Circuit's

discussion of § 1983 claims rested upon plaintiffs' ability to allege violations of their rights

under the Fourteenth Amendment as well as the ADA and Rehabilitation Act and, since the

Second Circuit reinstated the statutory claims, plaintiff's § 1983 claims were restored as well, id.

at 151, again without discussion of defendants' liability in their individual capacities or any

Eleventh Amendment analysis.

Given plaintiff's position that he did not sue the individual defendants in their personal

capacities and the rejection of such suits by other courts had plaintiff so sued them, the Court will

consider plaintiff's claims against them only in their official capacities.  The next issue then is

whether Eleventh Amendment immunity was abrogated by Title II of the ADA or the

Rehabilitation Act.

2.      Constitutional Violations

In United States v. Georgia, the Court held that Congress had power under § 5 of the

Fourteenth Amendment to create private remedies against states for "actual violations" of

provisions of the Fourteenth Amendment, 546 U.S. at 158.  "Thus, insofar as Title II [of the

18

ADA] creates a private cause of action for damages against the States for conduct that <u>actually</u> violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity," <u>id.</u> at 159 (emphasis in original).

Plaintiff alleges Eighth and Fourteenth Amendment violations and this Court need not decide the scope of Congress' abrogation of Eleventh Amendment immunity under Title II beyond a constitutional violation, <u>cf.</u> <u>United States v. Georgia</u>, <u>supra</u>, 546 U.S. at 160, 163 (Stevens, J., with Ginsburg, J., concurring).

To abrogate sovereign immunity, <u>Garcia</u> requires proof of discriminatory animus or ill will due to plaintiff's disability, 280 F.3d at 112; <u>see</u> <u>id.</u> at 105 (on summary judgment), while <u>United States v. Georgia</u> requires an "actual" Fourteenth Amendment violation, 546 U.S. at 159; <u>see</u> <u>Castello</u>, <u>supra</u>, 2007 U.S. Dist. LEXIS 30188, at *13.

Plaintiff argues that he alleged a constitutional violation of deliberate indifference in inadequately treating his severe rash or at least raised a material issue of fact (Docket No. 123, Pl. Memo. at 9-10) and that his placement in medical isolation was retaliatory (<u>id.</u> at 11-12), raising possible First Amendment violation and potential proof of animus or ill will.  He also argues that his medical records show due process and equal protection violations (<u>id.</u> at 10-11) by not testing him for TB or confirming defendants' diagnosis of TB.

As for the constitutional violation, <u>United States v. Georgia</u> implies that the mere allegation of an actual violation may suffice, since that case arose under a motion to dismiss, <u>see</u> 546 U.S. at 155.  This case, however, is on a motion for summary judgment, where both parties have raised (or had opportunity to raise) evidence to support the existence of an actual constitutional violation.  As discussed below, plaintiff **fails to assert an actual constitutional**

**violation to abrogate defendants' Eleventh Amendment immunity**.  For example, plaintiff now points to violations of his constitutional rights that <u>precede</u> his isolation, by arguing that his skin condition was not treated prior transfer from Eastern Correctional Facility to Five Points and that the transfer itself was retaliatory (<u>cf. id.</u> at 9 (six months prior to September 2005 isolation plaintiff complained of "'continuous [sic] ineffective treatment for severe, persistent skin rash condition'"), 11).  His allegations now are not restricted to his medical isolation.  As discussed below, plaintiff fails to establish a deliberate indifference claim as well as a retaliation or due process violation claims to abrogate Eleventh Amendment immunity.

As for the discriminatory animus or ill will, plaintiff does not allege or establish any animus or ill will on the part of the defendants.  The closest allegation is his retaliation claim, but (as discussed elsewhere in this Order) plaintiff fails to show how defendants at Five Points retaliated for his grievances and other activities in other facilities.

Plaintiff here fails to allege a constitutional violation or sufficient animus to state a claim under Title II of the ADA.  Since Eleventh Amendment immunity is not abrogated by these statutes, plaintiff's first, fifth, and sixth causes of action (as against all defendants), involving the ADA and the Rehabilitation Act, are **dismissed**.

E.     Retaliation

Next, defendants contend that plaintiff failed to establish retaliation or retaliatory animus to substantiate his claims (Docket No. 116, Defs. Memo. at 12-13).  Plaintiff alleges in his second cause of action that defendants used his disabilities to retaliate against him for his prior grievances in other facilities (Docket No. 92, Am. Compl. at 7).  To establish a claim for retaliation for the exercise of a constitutional right (presumably here vindicating his rights

through the grievance process), "Plaintiff must first show he was engaged in constitutionally protected conduct, and the conduct was a substantial motivating factor for adverse action taken against him by the defendant," Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) (Docket No. 116, Defs. Memo. at 12).  Plaintiff has a heavy burden, Lowrance v. Achtyl, 20 F.3d 529, 534-35 (2d Cir. 1994), to show that whatever permissible basis defendants cite for their actions to render it unlikely that defendants acted absent a retaliatory purpose, Rivera v. Senkowski, 62 F.3d 80, 86 (2d Cir. 1995) (id.).  Given the ease an inmate can claim any prison official's action is retaliatory, courts "examine prisoners' claims of retaliation with skepticism and particular care," Colon, supra, 58 F.3d at 872.

Plaintiff alleges retaliation from his transfer from Eastern Correctional Facility (with removal from his single inmate cell and from which he had pending grievances) to Five Points and a double cell.  He was transferred on August 26, 2005, and then was placed in medical isolation (without any medical basis, according to plaintiff) on September 21, 2005.  (See Docket No. 123, Pl. Memo. at 11-12, 13.)  He argues that this one month period shows the retaliatory causation (id. at 12, citing Graham v. Henderson, 89 F.3d 75, 80 (2d Cir. 1996)), and that "plaintiff stated a claim for 'causation' by alleging that after filing a grievance, plaintiff was placed in a psychiatric unit, due to the short length between the placement, and subsequent transfer, allegations support a 'retaliatory motive'" (id. at 12).  Graham involved an inmate alleging that a false misbehavior report was filed against him in retaliation for leading the filing of a grievance to protest the removal of inmate showers, 89 F.3d at 79, and not for placement in a psychiatric unit as plaintiff argues.

Here, while pursuing inmate grievances is a constitutionally protected activity under the First and Fourteenth Amendments, see, e.g., Graham, supra, 89 F.3d at 80; Varela v. Demmon, 491 F. Supp. 2d 442, 450 (S.D.N.Y. 2007), plaintiff only alleges that defendants in Five Points retaliated against him for prior grievances he filed while in Sing Sing and Eastern Correctional Facilities (see Docket No. 92, Am. Compl. at 7; see also id. at 4-5, listing other litigation[4]), without alleging which grievances those were, when they were commenced, or (more importantly) how these defendants at Five Points were aware of those grievances to retaliate against plaintiff for commencing them.  In opposition, plaintiff now argues that retaliation was shown by his transfer from Eastern Correctional Facility (and placement in a single cell) to Five Points and placement in a double cell and then, one month after his transfer, into medical isolation (Docket No. 122, Pl. Disputed Facts ¶ 7, Ex. C).  From other parts of the Amended Complaint, it appears that these grievances later became federal actions in 2004 and 2005 (see note 2, supra), possibly pending while plaintiff was placed in medical isolation in September to December 2005.  Plaintiff alleges that defendants used two disabilities as a "'covert' means" to retaliate against him (Docket No. 92, Am. Compl. at 7) by isolating him.  The only defendant possibly capable of knowing about plaintiff's Sing Sing or Eastern Correctional Facilities grievances was Poole.  Plaintiff has not made the connection between the non-Five Points grievances and his medical isolation that would make his placement in medical isolation retaliatory.  Plaintiff could have been tested for TB (pursuant to DOCS protocols, see Docket No. 118, Gregoire Decl. Ex. B, § 1.18 at 5) upon his transfer to Five Points unrelated to his prior

---

[4]The Amended Complaint notes a 2004 federal action against Sing Sing Correctional Facility officers in the Southern District of New York and a 2005 action against Eastern Correctional Facility staff in the Northern District of New York.

or pending grievances from other facilities.  Defendants have come forward with medical justification for plaintiff's isolation that is not pretextual (see Docket No. 116, Defs. Memo. at 13-15).  As a result, plaintiff's retaliation claims are **denied**.

      F.     Conspiracy

      Defendants contend that plaintiff failed to show that a conspiracy existed among the defendants (Docket No. 116, Defs. Memo. at 15-17).  The conspiracy allegations stem from the medical personnel at Five Points (including Dr. Gregoire) agreeing to medically isolate plaintiff on what he believes to be the absence of proof of active pulmonary tuberculosis (Docket No. 92, Am. Compl. at 13-14, 15-17, see also id. (general conspiracy alleged among defendants)).  Defendants argue that plaintiff has not alleged an understanding was reached among the conspiring defendants to violate plaintiff's rights, see Duff v. Coughlin, 794 F. Supp. 521, 525 (S.D.N.Y. 1992); Katz v. Morgenthau, 709 F. Supp. 1219, 1231 (S.D.N.Y.), aff'd in relevant part, 892 F.2d 20, 23 (2d Cir. 1989) (per curiam) (Docket No. 116, Defs. Memo. at 16).  Defendants dispute any role in the alleged conspiracy by Poole or Eagen (id. at 16-17).

      Plaintiff contends that defendants conspired in writing and orally in discussing his grievances, that defendants agreed to deny them even though the medical record to support his isolation was lacking or contradictory (Docket No. 123, Pl. Memo. at 14).  While arguing the pleading standard (id. at 14-15), plaintiff only makes conclusory allegations and recital of their roles, see Katz, supra, 709 F. Supp. at 1231, in diagnosing him, assigning him to medical isolation, and (in the case of Poole and Eagen) in handling his grievances that resulted.  At this summary judgment stage, plaintiff must not rely only upon his earlier pleadings but, by affidavits or other means, needs to set out facts showing a genuine issue for trial, Fed. R. Civ. P. 56(e)(2)

23

(effective Dec. 1, 2007).  Absent such a response, "summary judgment should, if appropriate, be

entered against that party," id.  This claim is **dismissed**.

       G.      Fourteenth Amendment Rights

          1.      Procedural Due Process

Defendants next argue that plaintiff was afforded all procedural process due to someone

in his situation (Docket No. 116, Defs. Memo. at 24-26).  To succeed on this § 1983 claim,

plaintiff needs to establish that he possessed a liberty or cognizable property interest that was

interfered with when he was placed in medical isolation and that he was deprived of those

interests without due process, Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 460

(1989); Bedoya v. Coughlin, 91 F.3d 349, 351-52 (2d Cir. 1996) (id. at 24).  As a prisoner, he

must allege that the State has granted inmates a protected liberty interest with respect to the terms

and conditions of confinement and defendants' actions created "atypical and significant

hardship," Shariff v. Artuz, No. 99 Civ. 321, 2000 U.S. Dist. LEXIS 12248, at *18 (S.D.N.Y.

Aug. 28, 2000) (id. at 25).  Defendants contend that plaintiff was placed in medical isolation

pursuant to Health Services Policy Manual § 1.18 (id. at 25).

Again, the chief factual issue underlying this case is whether defendants could reasonably

have suspected that plaintiff was positive for tuberculosis in September 2005 to justify his

medical isolation pending confirmation or treatment of TB.  Plaintiff alleges that he was not

positive for tuberculosis, relying upon the negative chest x-ray results.  In his response, plaintiff

disputes the accuracy of his medical records, in particular, the TB tests in 1992 and 1998, as well

as the TB diagnosis that lead to his 2005 isolation (see Docket No. 122, Pl. Disputed Facts ¶ 5,

Ex. B), but plaintiff fails to offer evidence showing the inaccuracies in his record or expert review of defendant's version of his medical record to show the deficiencies.

The only evidence plaintiff has produced are the entries in September 3, 1992, for positive TB results at both Sing Sing and Ulster Correctional Facilities (id. Ex. B).  In fact, plaintiff has two other federal actions pending that contest the validity of those tests (see Docket No. 92, Am. Compl. at 4-5).  While the 1992 entry presents an issue of fact, it is not material to preclude summary judgment here.

The symptoms in September 2005 indicating the presence of TB here were plaintiff's weight loss, bilateral abscesses at the axillae, combined with plaintiff's HIV status, his prior history of TB, and his refusal of treatment.  Plaintiff also disputes the 1998 and 2005 diagnoses but raises no evidence to support his contentions.  All he has presented is his conclusory assertions that disputes his diagnoses or (at a minimum) suggest the existence of a factual issue surrounding them.  Plaintiff's medical record produced in this case has shown that he has denied that he had TB as well as HIV at various times.  He has not presented evidence (such as contrary medical evidence or his own medical expert construing the medical record presented to the Court) to support his contention that he believes that he was misdiagnosed.  Further, he could have shortened this period of isolation by participating earlier in the testing and treatment.

Plaintiff thus fails to counter defendants' medical proof and his fourth cause of action is **denied**.

> 2.      Equal Protection

Defendants do not address plaintiff's fourth cause of action contention that Health Services Policy Manual § 1.18 discriminates against HIV positive inmates by treating them

differently than non-HIV positive inmates (see Docket No. 92, Am. Compl. at 10; Docket
No. 123, Pl. Memo. at 21).

Plaintiff cites Brown v. City of Oneonta, 221 F.3d 329, 337 (2d Cir. 2000), for setting
forth three ways to plead an Equal Protection Clause claim, concluding that he plead all three
(Docket No. 123, Pl. Memo. at 22). The first way is for a plaintiff pointing to a law or policy that
"'expressly classifies persons on the basis of race,'" Brown, supra, 221 F.3d at 337 (quoting
Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 213, 227-29 (1995)), or, as argued by plaintiff,
on the basis of a protected category (such as being HIV positive) (id.). Plaintiff does not allege
race but argues that HIV status is a protected classification. Plaintiff has not established that
persons with HIV are in a protected category under the Equal Protection Clause. The Equal
Protection Clause "directs that all persons similarly situated should be treated alike. . . .
However, 'the Constitution does not require things which are different in fact or opinion to be
treated in law as though they were the same,'" Spence v. Miles Labs., 810 F. Supp. 952, 961
(E.D. Tenn. 1992) (quoting Plyer v. Doe, 457 U.S. 202, 216 (1982), and citing Clerburne v.
Clerburne Living Center, 473 U.S. 432, 439 (1985)). In Spence, the district court held that HIV
positive status was not a suspect classification and that the Tennessee Legislature had a rational
basis for distinguishing AIDS from asbestos exposure in enacting the statute of repose that had
different treatment for either situation, 810 F. Supp. at 962-63; see also David v. Local 801,
Danbury Fire Fighters Ass'n, 899 F. Supp. 78, 80 (D. Conn. 1995) (rejecting as a protected class
those persons sexually affiliated with AIDS patients as not a suspect or quasi-suspect
classification). This Court, in Nolley v. County of Erie, 776 F. Supp. 715, 739 (W.D.N.Y. 1991)
(Curtin, J.), held that an HIV positive inmate carrying a contagious disease had not shown that

26

she was similarly situated with other inmates to state an Equal Protection Clause claim, see also
Nolley v. County of Erie, 802 F. Supp. 898, 901 (W.D.N.Y. 1992) (summarizing earlier holding
that defendants' segregation policy did not violate plaintiff's equal protection rights).

Second, Brown held that a plaintiff "could identify a facially neutral law or policy that
has been applied in an intentionally discriminatory manner," 221 F.3d at 337 (citing Yick Wo v.
Hopkins, 118 U.S. 356, 373-74 (1886)).  Plaintiff here, however, has not alleged any intent to
discriminate on the part of defendants here in applying § 1.18 to HIV positive inmates different
from non-HIV positive inmates.

Third, Brown stated that a plaintiff "could also allege that a facially neutral statute or
policy has an adverse effect and that it was motivated by discriminatory animus," 221 F.3d at 337
(citing Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 264-65
(1977)).  Plaintiff only argues the first part of this, that DOCS's policy had an "adverse and
discriminatory effect on inmates classified as (H.I.V. positive)" (id., internal quotations omitted).
He does not allege the second part that such effects were motivated by discriminatory animus.
Further, he produces no proof of such animus.  Therefore, on this pleading basis, plaintiff fails to
plead an Equal Protection Clause claim and this aspect of his claim is **denied**.

H.      Deliberate Indifference

Plaintiff's third cause of action alleges cruel and unusual punishment in being
deliberately indifferent to his severe skin rash by failing to treat it while he was in medical
isolation for about three months (see Docket No. 92, Am. Compl. at 7).  He does not complain
about the treatment of the ailments that were the reason for his medical isolation.

27

The Eighth Amendment prohibits infliction of "cruel and unusual punishment," U.S.

Const. art. VIII.  In order to state a claim for inadequate medical treatment under that

amendment, plaintiff must allege that defendants acted with "deliberate indifference to [a]

serious medical need," LaGrange v. Ryan, 142 F. Supp. 2d 287, 293 (N.D.N.Y. 2001); see

Estelle v. Gamble, 429 U.S. 97, 104 (1976); see also Gregg v. Georgia, 428 U.S. 153, 173 (1976)

(the Eighth Amendment prohibits infliction of "cruel and unusual punishments" which includes

punishments that "involve the unnecessary and wanton infliction of pain.") (citations omitted);

Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994), cert. denied sub nom. Foote v. Hathaway,

513 U.S. 1154 (1995).  "To establish an unconstitutional denial of medical care, a prisoner must

prove 'deliberate indifference to [his] serious medical needs.'" Hathaway, supra, 37 F.3d at 66

(quoting Estelle, supra, 429 U.S. at 104).  Mere negligent treatment or malpractice upon a

suspect, however, does not create an Eighth Amendment violation, see Corby v. Conboy,

457 F.2d 251, 254 (2d Cir. 1972).  This deliberate indifference claim has two elements, an

objective component, that the deprivation must be sufficiently serious; and a subjective

component, that the defendant official must act with sufficiently culpable state of mind.

Hathaway, supra, 37 F.3d at 66.  "Sufficiently serious" for the objective component contemplates

"a condition of urgency, one that may produce death, degeneration, or extreme pain." Nance v.

Kelly, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J., dissenting) (quoted in Hathaway, supra,

37 F.3d at 66).  Plaintiff needs to prove that defendants wantonly intended to cause him to suffer.

Wilson v. Seiter, 501 U.S. at 294, 302 (1991).

Defendants argue that plaintiff cannot establish either the objective or subjective elements

(Docket No. 116, Defs. Memo. at 18-20, 20-24).  As for the objective element, defendants assert

plaintiff's medical condition, his skin rash, was not "sufficiently serious," Hemmings v. Gorczyk,

134 F.3d 104, 108 (2d Cir. 1998), to have failure to treat it rise to the level of deliberate

indifference, see, e.g., Marshall v. Strack, No. 98 Civ. 6789, 1998 U.S. Dist. LEXIS 3136, at *1,

*7-9 (S.D.N.Y. Mar. 11, 1998), aff'd without opinion, 173 F.3d 845 (2d Cir. 1999) (rejecting

deliberate indifference claim for skin rash as serious medical condition) (id. at 18-19).

Defendants argue that plaintiff received medication for his stomach ache, gastrointestinal pain,

heartburn and skin condition (id. at 21-22; Docket No. 118, Gregoire Decl. ¶ 19).  As for the

subjective element, defendants contend that plaintiff received extensive medical care while in

isolation and that plaintiff fails to show the culpable state of mind of defendants to violate his

rights (Docket No. 116, Defs. Memo. at 20, 21-22).

Plaintiff alleges ineffective treatment of his rash since March 2005 (Docket No. 123, Pl.

Memo. at 16), before his transfer to Five Points and subsequent placement in medical isolation.

This prior ineffective treatment was not alleged in his Complaint.  Plaintiff's prior treatment and

transfer to Five Points is unrelated to the decision at that facility to place plaintiff in medical

isolation, the issue in this case.

Dr. Gregoire states that plaintiff was prescribed Hydrocortisone cream and Benadryl for

his rash and Alamag, Zantac, and Simethicome for his gastrointestinal pain and heartburn while

in isolation (Docket No. 118, Gregoire Decl. ¶ 19; Docket No. 122, Pl. Aff. Ex. A, Bates

Nos. 0171-74).  Thus, plaintiff received treatment for his skin and internal conditions while in

isolation, negating the objective element for his deliberate indifference claim.

The Southern District of New York's case in Marshall v. Strack is instructive; there,

plaintiff sought to sue the prison's dermatologist and prison official for failing to treat his skin

rash, 1998 U.S. Dist. LEXIS 3136, at *1-3.  The court dismissed his deliberate indifference claim

holding that plaintiff failed to meet the objective element because he merely claimed negligent or

inadequate treatment rather than a sufficiently serious and urgent condition, id. at *8-9, and failed

to establish the subjective element, id. at *9-10.

In the case at bar, plaintiff only alleges that he sought an appointment with a

dermatologist on August 29, 2005 (before his medical isolation), which was not granted and he

was deprived treatment of a severe skin rash (Docket No. 92, Am. Compl. at 8-9).  He also

alleged that he suffered "severe gastro-intestinal pain" while in isolation and lost 17 pounds

during two weeks of the isolation (id. at 9).  In opposition, plaintiff argues that there is a material

issue of fact as to the level of treatment for his skin condition he received while in isolation

(Docket No. 122, Pl. Disputed Facts ¶ 6) and since March 2005 (months before his isolation at

Five Points) (Docket No. 123, Pl. Memo. at 16).  These allegations fail to show a sufficiently

serious condition or conditions (such as leading to death or indicating severe pain) to meet the

objective element for a deliberate indifference claim.  Defendants have established that plaintiff

in fact was treated for his skin and intestinal conditions while in medical isolation (Docket

No. 118, Gregoire Decl. ¶ 19; Docket No. 122, Pl. Aff. Ex. A, Bates Nos. 0171-74).  Plaintiff

may not have been satisfied with the treatment he received, but that does not rise to the level of a

constitutional violation (or raise a material issue of fact) to establish the objective element for

deliberate indifference.

Plaintiff also fails to allege a sufficiently culpable state of mind of the individual

defendants treating (or failing to treat) him.  Plaintiff's argument (id. at 17-19) does not address

this subjective element for the deliberate indifference claim.

Therefore, plaintiff's third cause of action is **dismissed**.

* * *

In sum, plaintiff's case rests upon his dispute with defendants' diagnoses of tuberculosis

(and HIV) in the 1990s leading to his medical isolation in 2005 without showing evidence to

refute his medical record and the conclusion defendants reached in September 2005.  As a result,

plaintiff's claims are **dismissed**.

     I.       Plaintiff's Motion for Partial Summary Judgment

Plaintiff cross moved to seek partial adjudication of certain facts he deemed were not in

dispute (Docket No. 121).  One fact plaintiff sought adjudicated is whether Five Points receives

federal funds (Docket No. 123, Pl. Memo. at 25), for purposes of having the ADA and the

Rehabilitation Act apply, concluding that his claims under the ADA and the Rehabilitation Act

should be granted (id. at 8).  The Court **declines** to enter a judgment as to this fact since

resolution of that issue will not expedite the adjudication.  Even if Five Points received federal

funds, that fact alone does not establish a violation of the ADA or Rehabilitation Act.

Next, plaintiff seeks adjudication that he had negative x-ray results and no test for his

axillary abscesses for TB, based upon defendants' admissions in discovery (id.).  But defendant

Dr. Gregoire states in his declaration that plaintiff had "bilateral abscesses in the axillae, not

draining, which are symptomatic of extra pulmonary TB" (Docket No. 118, Gregoire Decl. ¶ 11;

see Docket No. 115, Defs. Statement ¶ 4).  In their Supplemental Responses to Plaintiff's Second

Request for Admission (Docket No. 73), defendants responded to the request regarding

Macomber admitting that "he did any diagnostic testing to verify that the plaintiff's 'Axillary

Abscesses' were caused by 'extra pulmonary T.B." that "because the Axillary Abscesses resolved

quickly with antibiotics, no cultures were obtained" (id. at 3-4 (Request #9); see also id. at 3

(Request #8 to Dr. Gregoire, asking for same admission)).  Plaintiff cites to other defense

discovery responses (Docket Nos. 72, 74) as providing admissions, but these discovery responses

do not support plaintiff's contention.  Therefore, plaintiff's motion for partial summary judgment

is **denied** as to this point.

       J.       Qualified Immunity

       Alternatively, if a constitutional violation is found, defendants as prison officials and

employees claim qualified immunity for their actions (Docket No. 116, Defs. Memo. at 28-30).

       When confronted by a claim of qualified immunity, one of the first questions for the

Court to resolve is do the facts, taken in the light most favorable to the party asserting the injury,

show the official's conduct violated a constitutional right.  See Saucier v. Katz, 533 U.S. 194,

201 (2001).  As required by the Saucier Court, the Court first considered (above) the

constitutional questions, then considered the qualified immunity question, id.  The discussion

above indicates whether a constitutional violation occurred.  Government officials performing

discretionary functions generally are shielded by qualified immunity from liability in their

individual capacities, see Frank v. Reilin, 1 F.3d 1317, 1327 (2d Cir. 1993), "insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  "If it

was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's

constitutional rights, the defendant may nevertheless be entitled to qualified immunity."

Anderson v. Creighton, 483 U.S. 635, 641 (1987); Lowth v. Town of Cheektowaga, 82 F.3d 563,

568-69 (2d Cir. 1996).  Particularly in the prison context, prison official defendants enjoy

qualified immunity from damage actions, Procunier v. Navarette, 434 U.S. 555 (1978).

As held above, here the Court found that there was no constitutional violation.  Hence, it

need not apply qualified immunity.

III.      Punitive Damages

Assuming a finding of liability, defendants next argue that plaintiff is not entitled to

punitive damages because such damages are not available under Title II of the ADA or the

Rehabilitation Act, Barnes v. Gorman, 536 U.S. 181, 189-90 (2002); see Bayon v. State Univ. of

N.Y. at Buffalo, No. 98CV578, 2001 U.S. Dist. LEXIS 1511, at *13-14 (W.D.N.Y. Feb. 15,

2001) (Elfvin, J.) (punitive damages not available under Title II of the ADA against defendants

in their individual capacity); see also City of Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981)

(Docket No. 116, Defs. Memo. at 26-28).  Further, plaintiff did not allege maliciousness or

wantonness to warrant punitive damages (id. at 27).  They do not address whether punitive

damages are allowed for plaintiff's constitutional claims.

Even if the constitutional claims allow for punitive damages, plaintiff here fails to allege

malice or wantonness on defendants' part to justify such damages.  Plaintiff's claim for punitive

damages is **denied.**

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment (Docket

No. 114) is **granted**.  In particular, claims against defendants State of New York, Thomas Poole

and Thomas Eagen are **dismissed** on Eleventh Amendment or failure to allege personal

involvement grounds.  Claims against the remaining individual defendants in their official

capacities are also **dismissed** on Eleventh Amendment grounds.  Plaintiff's claims are **denied** on substantive grounds discussed above.  Plaintiff's claims for punitive damages against all defendants is **denied**.  Plaintiff's motion for partial summary judgment (Docket No. 121) also is **denied**.  The Clerk of Court is instructed to enter judgment dismissing this case and closing it.

So Ordered.

_/s/ Hugh B. Scott_
Honorable Hugh B. Scott
United States Magistrate Judge

Dated: Buffalo, New York
       April 24, 2008